IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT JOHNSON, | : | |
| | : | |
| Petitioner | : | |
| | : | CIVIL NO. 4:07-CV-0369 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| | : | |
| ROBERT SHAW, *et al.*, | : | |
| | : | |
| Respondents | : | |

## MEMORANDUM

March 21, 2011

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

Petitioner Robert Johnson ("Petitioner" or "Johnson"), an inmate presently

confined at the State Correctional Institution at Somerset ("SCI Somerset") in

Somerset, Pennsylvania, initiated the above action *pro se* by filing a Petition for Writ

of Habeas Corpus ("Petition") under the provisions of 28 U.S.C. § 2254.  (Doc. 1.)

He challenges his 2003 conviction in the Dauphin County Court of Common Pleas.

For the reasons set forth herein, the Petition will be denied.

## I.    PROCEDURAL BACKGROUND

### A.    Johnson's Crimes

The circumstances that bring Robert Johnson to federal court as a habeas corpus

petitioner arose out of a series of escalating violent crimes in January 2002, a crime

spree that has been aptly described by the Pennsylvania Courts in the following terms:

> At the end of December, 2001, [a woman named] Nancy Gardner met
> [the petitioner, Robert] Johnson in Harrisburg.  (Notes of Testimony of
> Jury Trial dated January 13-17, 2003, volume 2, at 19-20). They rented a
> movie and Johnson ended up staying with Gardner at her apartment at
> 113 Fisher Avenue in Middletown, Dauphin County. (N.T. v.2 20).  On
> January 1, 2002, they had a dispute about disciplining Gardner's oldest
> daughter. (N.T. v.2 20-21). An argument ensued, leading to Johnson's
> departure. (N.T. v.2 21). However, when Johnson took money belonging
> to Gardner and threw her keys out a window, Gardner called the police.
> *Id.* Officer[] Kenneth Yoder of the Middletown Borough Police
> Department responded with his partner, helped Gardner to retrieve her
> belongings, and made sure that Johnson had left the premises. (N.T. v.2
> 21-22, v.3 192-195). Although Gardner told Officer Yoder that Johnson
> had a gun and some drugs, Yoder did not feel that he had enough
> information to do anything further. (N.T. v.3 197). However, he told
> Sergeant Peter D. Ranck, the supervisor of the next shift, about the
> domestic dispute and the report of a firearm and drugs. (N.T. v.3 23-24,
> 197).
>
> Shortly after the 11:00 p.m. shift change, the Middletown police received
> a second call from 113 Fisher Avenue indicating that Johnson had
> returned. (N.T. v.3 24). Officers Jeffrey Weaver and James Still were the
> first officers to respond to the scene. (N.T. v.3 24, v.2 49). When they
> arrived, they heard a male voice coming from the rear of the building.
> (N.T. v.2 50). Johnson was in an agitated state and would not respond to
> demands that he identify himself. (N.T. v.2 50-51). Sergeant Ranck
> arrived and saw that Johnson was being unruly and uncooperative, so he
> directed the officers to take physical control of Johnson, due in part to the
> earlier report of a gun and drugs. (N.T. v.3 25-27, v.2 51-52). Johnson
> became more violent and resisted the officers' efforts to control him.
> (N.T. v.3 27, v.2 52).
>
> A third officer, Officer Richard Beynon, arrived and tried to assist
> Officers Weaver and Still. (N.T. v.2 52, v.3 7). Officer Weaver was able

2

to take Johnson to the ground at one point (N.T. v.2 53) and struck Johnson in the shoulder in an effort to get Johnson to release his arm. (N.T. v.2 54). While Sergeant Ranck came to assist the other officers, Johnson managed to get back on his feet and Officer Still fell to the ground. (N.T. v.3 28, v.2 57). When Officer Weaver reached for his pepper spray, there was a shot from a small caliber weapon, and he felt a burning sensation in his shoulder. (N.T. v.2 58). While Officer Weaver, Officer Still and Officer Beynon did not see the gun (N.T. v.2 78, 89, v.3 9), Sergeant Ranck saw Johnson pull the gun from somewhere in front of himself. (N.T. v.3 29).

There was another shot, and Officer Beynon yelled that he was hit. (N.T. v.2 59). When Johnson tried to point the gun at Sergeant Ranck, the sergeant was able to grab Johnson's arm. (N.T. v.3 29). Johnson fired a round that went by Sergeant Ranck's head. *Id.* Sergeant Ranck was able to keep the gun pointed up in the air while Johnson fired two more shots. (N.T. v.3 30).

As Johnson broke away from Sergeant Ranck and fled, Officer Weaver was able to draw his own weapon and fire two shots at Johnson. (N.T. v.2 59). Johnson kept running. *Id.* Sergeant Ranck ordered Weaver to stay with Officer Beynon and Officer Still, called for assistance, and began chasing Johnson. (N.T. v.3 34-35). With the assistance of neighbors, Sergeant Ranck was able to determine the route taken by Johnson. (N.T. v.3 35).

Meanwhile, officers of the Susquehanna Regional Airport Authority ("SARAA") Police heard the message that two officers were down and responded. (N.T. v.3 152). Based on their path of travel, Officers Harry Cleland, Jr., and Michael Shetter came upon Johnson running towards them in the area of Ann and Grant Streets, near a church. (N.T. v.3 154). Johnson ran around a tractor-trailer that was parked on the road while the SARAA officers exited their car. (N.T. v.3 155). Officer Cleland chased Johnson on foot around the church but lost sight of Johnson. (N.T. v.3 156).

Eventually, Johnson emerged from some bushes near Officer Cleland. *Id.* While the officer yelled at Johnson to put his hands up and to get down on the ground, Johnson kept telling Officer Cleland, "Just shoot me."

(N.T. v.3 156-157). When Johnson made a sudden, twisting move while saying, "Kill me or I will kill you," Officer Cleland fired two rounds. (N.T. v.3 157). Johnson fell to the ground but moved his hands to his waist. (N.T. v.3 157-158). While Officer Cleland asked if Johnson was hit, Johnson kept telling the officers to kill him. (N.T. v.3 158). Officer Cleland approached Johnson and tried to hold him down, but Johnson got up and started running. *Id.* Johnson first ran into a tree but collected his sense and ran around the church again. **Id.** Both of the SARAA officers followed but Officer Cleland tired and could not keep up the chase. (N.T. v.3 159). Officer Cleland realized that Johnson was trying to reach their car, which had the lights on, doors open, and engine running. *Id.* While Officer Shetter tried to catch Johnson, Johnson reached the car and got in. *Id.* The car went into reverse, the tires squealed, and it headed directly for Officer Cleland. (N.T. v.3 159-160). As Officer Cleland aimed his gun at the car, it came too close to him and he had to jump out of the way to avoid being hit. (N.T. 161). The car went by and Officer Cleland heard a crash as the police car hit a pickup truck. (N.T. 161-162).

Officer Yoder, after telling Sergeant Ranck about the domestic dispute, had changed his clothes and left the Middletown police station for home. (N.T. v.3 197). En route, he heard the radio dispatch about officers being down and turned back to the scene. (N.T. v.3 198). He proceeded toward the entrance to the airport as a result of the ongoing radio calls. (N.T. v.3 199). He followed Highspire police officers responding to the scene and parked his pickup truck at the intersection of Ann and Grant Streets. (N.T. v.3 200-201). After Officer Yoder got out of his truck, the car being driven in reverse by Johnson slammed into the pickup truck. (N.T. v.3 201-202).

Johnson made a few attempts to restart the police car but could not, and he was taken into custody by a number of police officers that surrounded the car. (N.T. v.3 204-205). The revolver that Johnson used to shoot the officers was recovered from underneath a car along the route of Johnson's flight. (N.T. v.3 119-120, v.4 33-34).

(Doc. 13, Ex. N, 2/24/05 Pa. Super. Ct. Op., pp.1-4.)

**B.    Johnson's State Trials and Convictions**

As a result of this crime spree, on January 1, 2002, Johnson was charged with four counts of Criminal Attempt, Homicide, seven counts of Aggravated Assault, Possession with Intent to Deliver a Controlled Substance, Theft by Unlawful Taking, Carrying Firearms without a License, two counts of Flight to Avoid Apprehension, seven counts of Recklessly Endangering Another Person, and two counts of Resisting Arrest. One week later, on January 7, 2002, a second Criminal Complaint was filed against Johnson, charging him with two counts of being a Prohibited Person in Possession of Firearms, Possessing Instruments of Crime, and False Reports to Law Enforcement Authorities.

On January 14, 2003, Johnson proceeded to a jury trial on these charges in the Dauphin County Court of Common Pleas. At the conclusion of this first trial, the jury returned a mixed verdict, convicting Johnson of ten counts, acquitting him of six counts, and reaching a deadlock with respect to eight counts as to which the jury was unable to reach a unanimous verdict.[1]

Following the declaration of a mistrial on the deadlocked charges, on August 8, 2003, the Commonwealth re-tried Johnson on these eight remaining counts. At the close of this retrial, the second jury found Johnson guilty of all of the remaining eight counts. Ultimately, Johnson was convicted and sentenced on the following offenses:

---

[1]One other count was dismissed by the court.

Criminal Attempt Homicide (three counts); Aggravated Assault (three counts); Possession with Intent to Deliver a Controlled Substance; Firearms-Carrying without a License; Theft by Unlawful Taking; Recklessly Endangering Another Person (five counts); Flight to Avoid Apprehension (two counts); Resisting Arrest (two counts); Possessing Instruments of Crime; and False Reports to Law Enforcement Authorities.

On October 30, 2003, Johnson was sentenced to an aggregate term of imprisonment for 40½ to 81 years following his conviction at trial on these charges.

### C.      Johnson's State Appeal

Johnson appealed this conviction and sentence.  On direct appeal, Johnson raised four claims, two of which are reprised in this federal habeas corpus petition. Specifically, Johnson alleged that his multiple convictio0sn should be set aside because: (1) there was insufficient evidence to sustain the attempted homicide charges; (2) the trial court erred in its jury instructions; (3) the trial court erred in failing to dismiss the prospective jury panel after it learned that some potential jurors might have briefly and inadvertently seen the defendant in handcuffs; and (4) that the re-trial of the defendant following the jury's deadlock and the declaration of a mistrial at his first trial on eight charges violated Double Jeopardy. These latter two issues now form the basis for Johnson's current federal habeas petition. (Doc. 1)

Initially, on direct appeal, the  Pennsylvania Superior Court dismissed this

appeal on procedural grounds.  (Doc. 13, Ex. K, *Commonwealth v. Johnson*, No. 1901 MDA 2003, 8/27/04 Pa. Super. Ct. Unpublished Mem. Op.) The trial court then prepared a November 12, 2004 memorandum opinion pursuant to Pa. R. App. P. 1925(a) fully addressing the issues which Johnson sought to raise on appeal.  (Doc. 13, Ex. M.)  The Superior Court then reinstated Johnson's appeal and, on February 24, 2005, issued an opinion and order affirming Johnson's conviction and sentence.  (Doc. 13, Ex. N, *Commonwealth v. Johnson*, No. 1901 MDA 2003, 2/24/05 Pa. Super. Ct. Op.)

In this ruling the Superior Court expressly addressed, and rejected, Johnson's claim that the trial judge erred in permitting prospective jurors to briefly view him in handcuffs.  (*Id.*)  The Superior Court rejected this contention on two grounds, finding first as a factual matter that the trial court was correct when it concluded that the prospective jurors had not seen Johnson in handcuffs.  (Doc. 13, Ex. N., p. 6.)  The Superior Court then went on to reject Johnson's claims as a matter of law, holding that "[a] brief accidental sighting of a defendant in custodial trappings, without more, is not so inherently prejudicial as to significantly impair the presumption of innocence." (*Id.*)   The Superior Court also disposed of Johnson's Double Jeopardy argument summarily, observing that the re-trial of the defendant following a jury deadlock on some charges at his initial trial did not in any way offend constitutional Double

7

Jeopardy principles.  (*Id.*)

Following this adverse ruling, on March 22, 2005, Johnson filed a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania.  (Doc. 13, Ex. O.)  On August 2, 2005 The Pennsylvania Supreme Court denied Johnson's Petition for Allowance of Appeal.  (Doc. 13, Ex. P.)

### D.    Johnson's PCRA Petition

Eight months later, on April 7, 2006, Johnson, acting *pro se*, filed a petition for relief under the Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. Ann. §§ 9541 et seq.  (Doc. 13, Ex. Q.)  This petition alleged, without any further supporting argument, that Johnson had received ineffective assistance of counsel. (*Id.*)  The trial court, sitting as PCRA court, appointed counsel to represent Johnson in connection with this PCRA petition, and granted Johnson leave to file an amended PCRA petition, in order to permit Johnson to support the very vague and general allegations which he made in his initial *pro se* pleading.  (Doc. 13, Ex. R.) Four months later, on August 4, 2006, appointed counsel filed a Petition to Withdraw as Counsel, having identified no issues of merit to raise in an amended PCRA petition. (Doc. 13, Ex. S.)  Counsel's petition was granted by the state court on August 16, 2006.  (Doc.13, Ex. T.)  One month later, on September 11, 2006, the PCRA court dismissed this unlitigated PCRA petition, and notified Johnson of his right to appeal

this ruling. (Doc. 13, Ex. U .) Despite being notified of his appellate rights, Johnson did not appeal from the dismissal of his PCRA petition. Thus, the ineffective-assistance-of-counsel claims remained entirely unexhausted, and were procedurally defaulted by Johnson.

### E. Johnson's Federal Habeas Petition

Instead of pursuing and properly exhausting his state remedies, Johnson elected to the file the instant Petition for Writ of Habeas Corpus in federal court. (Doc. 1.) In his Petition, Johnson summarily raises four claims, two of which were plainly never exhausted and two of which were conclusively resolved against Johnson in the state proceedings. Johnson's unexhausted claims consist of his assertions that: (1) his trial counsel was ineffective, a claim he abandoned by failing to pursue to his PCRA petition; and (2) Johnson's argument that the trial judge erred by imposing some consecutive sentences upon him, a claim never pursued either on direct appeal or in Johnson's aborted PCRA petition. (*Id.*) Johnson's exhausted claims were two contentions that were thoroughly addressed by the state courts on his direct appeal, namely, (1) Johnson's claim that the trial judge erred in allowing him to be seen briefly by prospective jurors in handcuffs, and (2) Johnson's assertion that his re-trial following a jury deadlock on some charges at his first trial offended Double Jeopardy.

These habeas claims have been fully briefed and now are ripe for resolution.

For the reasons set forth below, Johnson's Petition will be denied.

## II.    DISCUSSION

### A.    State Prisoner Habeas Relief–The Legal Standard

A state prisoner seeking to invoke the power of this Court to issue a writ of

habeas corpus must satisfy the standards prescribed by 28 U.S.C. § 2254, which

provides in part as follows:

> **(a)** The Supreme Court, a Justice thereof, a circuit judge, or a district
> court shall entertain an application for a writ of habeas corpus in behalf
> of a person in custody pursuant to the judgment of a State court only on
> the ground that he is in custody in violation of the Constitution or laws or
> treaties of the United States.
>
> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> unless it appears that--
>
> **(A)** the applicant has exhausted the remedies available in the courts of the
> State;
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> **(2)** An application for a writ of habeas corpus may be denied on the
> merits, notwithstanding the failure of the applicant to exhaust the
> remedies available in the courts of the State.

28 U.S.C. § 2254 (a) and (b).

### 1.    Substantive Standards For Habeas Petitions

As this statutory text implies, state prisoners must meet exacting substantive

and procedural benchmarks in order to obtain habeas corpus relief.  At the outset, a

petition must satisfy exacting substantive standards to warrant relief.  Federal courts

may "entertain an application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in

custody in violation of the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).  By limiting habeas relief to state conduct which violates "the

Constitution or laws or treaties of the United States," § 2254 places a high threshold

on the courts. Typically, habeas relief will only be granted to state prisoners in those

instances where the conduct of state proceedings led to a "fundamental defect which

inherently results in a complete miscarriage of justice" or was completely inconsistent

with rudimentary demands of fair procedure.  *See, e.g., Reed v. Farley*, 512 U.S. 339,

354 (1994).  Thus, claimed violations of state law, standing alone, will not entitle a

petitioner to § 2254 relief, absent a showing that those violations are so great as to be

of a constitutional dimension.  *See Priester v. Vaughan*, 382 F.3d 394, 401-02 (3d Cir.

2004).

## 2.    Deference Owed to State Court Rulings

These  same principles which inform the standard of review in habeas petitions

and limit habeas relief to errors of a constitutional dimension also call upon federal

courts to give an appropriate degree of deference to the factual findings and legal rulings made by the state courts in the course of state criminal proceedings.  There are two critical components to this deference mandated by 28 U.S.C. § 2254.

First, with respect to legal rulings by state courts, under §2254(d), habeas relief is not available to a petitioner for any claim that has been adjudicated on its merits in the state courts unless it can be shown that the decision was either: (1) "contrary to" or involved an unreasonable application of clearly established case law; *see* 28 U.S.C. §2254(d)(1); or (2) was "based upon an unreasonable determination of the facts," *see* 28 U.S.C. §2254(d)(2).  Applying this deferential standard of review, federal courts frequently decline invitations by habeas petitioners to substitute their legal judgments for the considered views of the state trial and appellate courts.  *See Rice v. Collins*, 546 U.S. 333, 338-39 (2006); *see also Warren v. Kyler*, 422 F.3d 132, 139-40 (3d Cir. 2005); *Gattis v. Snyder*, 278 F.3d 222, 228 (3d Cir. 2002).

In addition, § 2254(e) provides that the determination of a factual issue by a state court is presumed to be correct unless the petitioner can show by clear and convincing evidence that this factual finding was erroneous.  *See* 28 U.S.C. §2254(e)(1).  This presumption in favor of the correctness of state court factual findings has been extended to a host of factual findings made in the course of criminal proceedings.  *See, e.g., Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam);

12

*Demosthenes v. Baal*, 495 U.S. 731, 734-35 (1990).

This principle mandating deference to state court factual determinations specifically applies to state court findings relating to the competence of criminal defendants. Thus, federal courts are not free to substitute their views for the findings of state judges on issues of competence to stand trial, *Maggio*, 462 U.S. at 117, competence to waive rights, *Demosthenes*, 495 U.S. at 734-35, or whether the defendant's mental competence affected his ability to comply with post-conviction petition filing deadlines. *Nara v. Frank*, 488 F.3d. 187, 200-01 (3d Cir. 2007) (state court finding that defendant's mental incompetence interfered with his ability to file timely petition entitled to a presumption of correctness). Rather, these factual findings must be presumed to be correct unless the petitioner can show by clear and convincing evidence that they were erroneous. *See* 28 U.S.C. § 2254(e)(1). Furthermore, in a case such as this, where a state court judgment rests upon factual findings, it is also well-settled that:

> A state court decision based on a factual determination, . . . , will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceeding. *Miller-El v. Cockrell,* 537 U.S. 322 (2003). We must presume that the state court's determination of factual issues was correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn,* 209 F.3d 280, 285 (3d Cir.2000). A state court's finding of the absence of discriminatory intent is "a pure issue of fact accorded significant deference," which will not be overturned unless clearly erroneous. *Miller-El*, 123 S.Ct. at 1040-41

(citation omitted).

*Rico v. Leftridge-Byrd*,  340 F.3d 178, 181 (3d Cir. 2003).

### 3. Procedural Thresholds for Section 2254 Petitions.

#### a. Exhaustion of State Remedies and Procedural Default.

State prisoners seeking relief under section 2254 also must satisfy specific, and precise, procedural standards. Among these procedural prerequisites is a requirement that the petitioner " has exhausted the remedies available in the courts of the State" before seeking relief in federal court. 28 U.S.C. § 2254(b). In instances where a state prisoner has failed to exhaust the legal remedies available to him in the state courts, federal courts typically will refuse to entertain a petition for habeas corpus. *See Whitney v. Horn*, 280 F.3d. 240, 250 (3d Cir. 2002).

This statutory exhaustion requirement is rooted in principles of comity and reflects the fundamental idea that the state should be given the initial opportunity to pass upon and correct alleged violations of the petitioner's constitutional rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999).  As the Supreme Court has aptly observed: "a rigorously enforced total exhaustion rule" is necessary in our dual system of government to prevent a federal district court from upsetting a state court decision without first providing the state courts the opportunity to correct a constitutional violation.  *Rose v. Lundy*, 455 U.S. 509, 518 (1982).  Requiring exhaustion of claims

14

in state court also promotes the important goal of ensuring that a complete factual record is created to aid the federal courts in their review of a § 2254 petition. *Walker v. Vaughn*, 53 F.3d 609, 614 (3d Cir. 1995). A petitioner seeking to invoke the writ of habeas corpus, therefore, bears the burden of showing that all of the claims alleged have been "fairly presented" to the state courts, and the claims brought in federal court must be the "substantial equivalent" of those presented to the state courts. *Evans v. Court of Common Pleas*, 959 F.2d 1227, 1231 (3d Cir. 1992); *Santana v. Fenton*, 685 F.2d 71, 73-74 (3d Cir. 1982). A petitioner cannot avoid this responsibility merely by suggesting that he is unlikely to succeed in seeking state relief, since it is well-settled that a claim of "likely futility on the merits does not excuse failure to exhaust a claim in state court." *Parker v. Kelchner*, 429 F.3d 58, 63 (3d Cir. 2005).

While this exhaustion requirement compels petitioners to have previously given the state courts, a fair "opportunity to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim," *Picard v. Connor*, 404 U.S. 270, 276 (1971), this requirement is to be applied in a commonsense fashion. Thus, the exhaustion requirement is met when a petitioner submits the gist of his federal complaint to the state courts for consideration, without the necessity that the petitioner engage in some "talismanic" recitation of specific constitutional claims. *Evans*, 959 F.2d at 1230-33. Similarly, a petitioner meets his obligations by fairly presenting a

claim to the state courts, even if the state courts decline to specifically address that claim. *See Dye v. Hofbauer*, 546 U.S. 1 (2005) (per curiam); *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004).

A necessary corollary of this exhaustion requirement is the procedural default doctrine which applies in habeas corpus cases. Certain habeas claims, while not exhausted in state court, may also be incapable of exhaustion in the state legal system by the time a petitioner files a federal habeas petition because state procedural rules bar further review of the claim. In such instances:

> In order for a claim to be exhausted, it must be 'fairly presented' to the state courts "by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). If a claim has not been fairly presented to the state courts and it is still possible for the claim to be raised in the state courts, the claim is unexhausted. . . .

> If a claim has not been fairly presented to the state courts but state law clearly forecloses review, exhaustion is excused, but the doctrine of procedural default may come into play. A procedural default occurs when a prisoner's federal claim is barred from consideration in the state courts by an 'independent and adequate' state procedural rule. Federal courts may not consider the merits of a procedurally defaulted claim unless the applicant establishes "cause" to excuse the default and actual "prejudice" as a result of the alleged violation of the federal law or unless the applicant demonstrates that failure to consider the claim will result in a fundamental "miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

*Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d. Cir. 2002) (citations omitted).

"[A] federal court will ordinarily not entertain a procedurally defaulted

16

constitutional claim in a petition for habeas corpus '[o]ut of respect for finality, comity, and the orderly administration of justice.' This is a reflection of the rule that 'federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds.'" *Hubbard v. Pinchak* , 378 F.3d 333, 338 (3d. Cir. 2004)(citations omitted). Given these concerns of comity, the exceptions to the procedural default rule, while well-recognized, are narrowly defined. Thus, for purposes of excusing a procedural default of a state prisoner seeking federal habeas relief, "[t]he Supreme Court has delineated what constitutes 'cause' for the procedural default: the petitioner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Werts v. Vaughn*, 228 F.3d 178, 192-193 (3d. Cir. 2000) (citations omitted).  Similarly, when examining the second component of this "cause and prejudice" exception to the procedural default rule, it is clear that:

> With regard to the prejudice requirement, the habeas petitioner must prove  'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'   This standard essentially requires the petitioner to show he was denied 'fundamental fairness' at trial. In the context of an ineffective assistance claim, we have stated that prejudice occurs where 'there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.'

17

*Id.* at 193 (citations omitted).

Similarly, the "miscarriage of justice" exception to this procedural bar rule is also narrowly tailored, and requires a credible assertion of actual innocence to justify a petitioner's failure to comply with state procedural rules.  *Hubbard*, 378 F.3d at 338.

Procedural bar claims typically arise in one of two factual contexts. First, in many instances, the procedural bar doctrine is asserted because an express state court ruling in prior litigation denying consideration of a habeas petitioner's state claims on some state procedural ground. In such a situation, courts have held that:

> A habeas claim has been procedurally defaulted when 'a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.' *Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). For a federal habeas claim to be barred by procedural default, however, the state rule must have been announced prior to its application in the petitioner's case and must have been 'firmly established and regularly followed.' *Ford v. Georgia,* 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). Whether the rule was firmly established and regularly followed is determined as of the date the default occurred, not the date the state court relied on it, *Doctor v. Walters,* 96 F.3d 675, 684 (3d Cir.1996), because a petitioner is entitled to notice of how to present a claim in state court, *Ford,* 498 U.S. at 423-424, 111 S.Ct. 850.

*Taylor v. Horn*, 504 F.3d 416, 427-428 (3d. Cir. 2007).

In other instances, the procedural bar arises, not because of an express state court ruling, but as a consequence of a tactical choice by a habeas petitioner, who

18

elects  to waive or forego a claim in the course of his state proceedings, and thus fails

to fully exhaust the claim within the time limits prescribed by state statute or

procedural rules. In such instances the petitioner's tactical choices in state court

litigation also yield procedural defaults and waivers of claims federally.  *See, e.g.,*

*Johnson*, *supra*, 392 F.3d 551 (procedural default when petitioner failed to timely

pursue state claim); *Hull v. Freeman*, 991 F.2d 86 (3d. Cir. 1993)(same). Accordingly,

a petitioner's strategic choices in state court waiving or abandoning state claims may

act as a procedural bar to federal consideration of his claims, unless the petitioner can

show either "cause and prejudice" or demonstrate a "fundamental miscarriage of

justice."  *Id*.


**B.     Johnson's Petition Must be Denied Because It Contains Either
         Unexhausted Claims and Procedurally Defaulted Claims, or Claims
         That Are Meritless**

In this case, Johnson' claims run afoul of two procedural and substantive

obstacles.  First, those claims that are properly exhausted are plainly without merit.

Second, Johnson's remaining claims are unexhausted and procedurally defaulted.

These flawed claims are discussed separately below.

19

### 1.     Johnson's Double Jeopardy Claim Is Meritless

At the outset, Johnson's Double Jeopardy claim fails because it is evident that Johnson cannot show that the state court rulings rejecting this claim as a matter of constitutional law were either: (1) "contrary to" or involved an unreasonable application of clearly established case law, *see* 28 U.S.C. §2254(d)(1), or (2) "based upon an unreasonable determination of the facts," *see* 28 U.S.C. §2254(d)(2).

Quite the contrary, the state court ruling rejecting Johnson's efforts to interpose a hung jury as a bar to re-trial under the Double Jeopardy Clause is rebutted by two centuries of constitutional jurisprudence.  For the past 180 years the United States Supreme Court has recognized that the re-trial of a defendant like Johnson following the declaration of a mistrial does not offend the constitutional protections against Double Jeopardy,  provided that there was a manifest necessity for the declaration of a mistrial.  *United States v. Perez*, 22 U.S. 579, 580 (1824).  In this case,  Johnson's mistrial followed a jury deadlock.  In such instances where a jury cannot reach a verdict, it is absolutely clear that there is a manifest necessity for a mistrial, and the retrial of the defendant simply does not implicate the double jeopardy clause of the constitution.  *See, e.g., United States v. Perez, supra* (retrial following jury deadlock); *United States v. Console*, 13 F.3d 641, 663-64 (3d Cir. 1993)(manifest necessity because jury deadlocked).  Thus, the initial jury deadlock in Johnson's case justified a

mistrial declaration, and permitted the re-trial of this defendant without offending the

Double Jeopardy clause of the Constitution.

### 2.   Johnson's Complaint Regarding Prospective Jurors Seeing Him in Handcuffs Does Not Warrant Habeas Relief

Similarly, Johnson's claim that his conviction should be set aside because

prospective jurors may have briefly and inadvertently seen him in handcuffs plainly

does not justify habeas relief.  This claim was expressly addressed, and rejected, by

the Superior Court on two grounds.  First, the Superior Court found as a factual matter

that the trial court was correct when it concluded that the prospective jurors had not

seen Johnson in shackles.  (Doc. 13, Ex. N, p. 6.)  The Superior Court then went on to

reject Johnson's claims as a matter of law, holding that "[a] brief accidental sighting

of a defendant in custodial trappings, without more, is not so inherently prejudicial as

to significantly impair the presumption of innocence."  (*Id.*)      As for the state

court's factual finding that prospective jurors did not observe Johnson in handcuffs,

we must presume that the state court's determination of factual issues was correct, and

the petitioner bears the burden of rebutting this presumption by clear and convincing

evidence. 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn,* 209 F.3d 280, 285 (3d

Cir.2000).  In this case, Johnson presents no such clear and convincing evidence

which would undermine this state court factual finding, a factual finding which is fatal

21

to this habeas claim.

Moreover, Johnson cannot assail the state appellate court's legal conclusion that there was no prejudicial error here.  In this regard the Superior Court rejected Johnson's claim as a matter of law, holding that "[a] brief accidental sighting of a defendant in custodial trappings, without more, is not so inherently prejudicial as to significantly impair the presumption of innocence."  (*Id.*)  Under § 2254(d), habeas relief is not available to a petitioner for any claim that has been adjudicated on its merits in the state courts unless it can be shown that the decision was either: (1) "contrary to" or involved an unreasonable application of clearly established case law, *see* 28 U.S.C. §2254(d)(1), or (2) was "based upon an unreasonable determination of the facts," *see* 28 U.S.C. §2254(d)(2).

Applying this deferential standard of review, federal courts frequently decline invitations by habeas petitioners to substitute their legal judgments for the considered views of the state trial and appellate courts.  *See Rice v. Collins*,  546 U.S. 333, 338-39 (2006); *see also Warren v. Kyler*, 422 F.3d 132, 139-40 (3d Cir. 2005);  *Gattis v. Snyder*, 278 F.3d 222, 228 (3d Cir. 2002).  This deferential standard of review of review also compels us to reject this claim regarding possibility that the jury saw Johnson in handcuffs since the state court's application of the law to these facts was, in fact, entirely consistent with federal case law, which has "long held that a brief,

22

unintended glimpse of a defendant in handcuffs is not inherently prejudicial and does

not require a mistrial without an affirmative showing of actual prejudice. *See United*

*States v. Chrzanowski,* 502 F.2d 573, 576 (3d Cir.1974) ("The fact that jurors may

briefly see a defendant in handcuffs is not so inherently prejudicial as to require a

mistrial."); *United States v. Simpson,* 950 F.2d 1519, 1522 (10th Cir.1991) (collecting

cases); *United States v. Roane*, 338 F.App'x 127, 130 (3d Cir. 2009).  Since this ruling

is wholly in accord with settled federal case law, it provides no basis under

§ 2254(e) for federal habeas relief.

### 3.      Johnson's Remaining Claims Are Procedurally Defaulted

Finally, in the instant Petition, Johnson summarily raised two claims which

were  never exhausted and are now procedurally defaulted.  Specifically,  Johnson's

unexhausted claims consisted of his assertions that: (1) his trial counsel was

ineffective, a claim he abandoned by failing to pursue to his PCRA petition; and (2)

Johnson's argument that the trial judge erred by imposing some consecutive sentences

upon him, a claim never pursued either on direct appeal or in Johnson's aborted

PCRA petition. (*Id*.)

Johnson's failure to pursue these claims at trial, on direct appeal, or through his

state PCRA petition now precludes him procedurally from re-litigating these

abandoned issues further in state court under the settled statute of limitations that applies to Pennsylvania PCRA petitions. That tactical choice, therefore, now acts as a procedural bar to pursuit of these unexhausted yet procedurally defaulted claims in this federal habeas proceeding.  *See, e.g., Johnson, supra*, 392 F.3d 551 (procedural default when petitioner failed to timely pursue state claim); *Hull*, *supra,* 991 F.2d 86 (same).  Moreover, Johnson neither has demonstrated "cause and prejudice" in connection with his procedural default of these claims, nor has he asserted that a fundamental miscarriage of justice would result if his claims were not reviewed.  *See Werts*, 228 F.3d at 192-93; *Hubbard*, 378 F.3d at 338.

## III.   CONCLUSION

For the foregoing reasons, the instant Petition for Writ of Habeas Corpus will be denied.  We also will deny a certificate of appealability based on the reasoning in this Memorandum.  However, Petitioner is advised that he has the right for thirty (30) days to appeal our Order denying his Petition, *see* Federal Rule of Appellate Procedure 4, and that our denial of a certificate of appealability does not prevent him from doing so, as long as he also seeks, and obtains, a certificate of appealability from the court of appeals, *see* 28 U.S.C. § 2253.  An Order consistent with this Memorandum will issue on today's date.